**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Civil Action No. 1:26-CV-162**

| | |
|---|---|
| JESSICA M. GEORG,<br><br>     Plaintiff,<br><br> v.<br><br>COSTCO WHOLESALE<br>CORPORATION,<br><br>     Defendant. | **COMPLAINT**<br>**(Jury Trial Demanded)** |

COMES NOW, Plaintiff Jessica M. Georg ("Plaintiff"), by and through undersigned counsel, requesting a jury trial and alleging the following against Defendant Costco Wholesale Corporation ("Costco" or "Defendant"):

## **INTRODUCTION**

During her employment with Defendant, Plaintiff was subjected to severe and pervasive sexual harassment by a supervisor, David Wiggins ("Wiggins"), beginning as early as 2012 and continuing through March 2023, including sexually explicit comments about her body, unwanted sexual advances, and sexual assault in August 2017. Despite reporting the harassment and assault to management on multiple occasions – in 2017, 2020, and 2022 – Defendant failed to take prompt and

1

appropriate corrective action, allowing Wiggins to continue harassing Plaintiff and other female employees for years.

After Plaintiff escalated her complaints to corporate management in August 2022, Defendant retaliated against her by reducing her cashier hours, issuing a negative performance evaluation, disciplining and suspending her for disability-related absences, and creating a hostile work environment. The U.S. Equal Employment Opportunity Commission ("EEOC") investigated Plaintiff's charge and issued a determination on July 11, 2025, finding reasonable cause to believe that Defendant violated Title VII by subjecting Plaintiff to sexual harassment and retaliation.

Wiggins was ultimately terminated in March 2023, *after* Plaintiff filed her EEOC Charge in December 2022 and *after* Defendant's outside counsel investigation substantiated complaints from multiple female employees. But his termination was too little too late. By that time, Wiggins had been sexually harassing multiple women at the Winston-Salem warehouse for at least twelve years. Defendant had knowledge of Wiggins' propensity and pattern of sexual harassment since at least 2011.

As a result, Plaintiff has filed this action for sexual harassment, hostile work environment, sex discrimination, and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*, and for interference and

2

retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. This lawsuit seeks to remedy severe emotional distress, humiliation, loss of income, and other damages Plaintiff has suffered because of Defendant's unlawful conduct.

## PARTIES

1. Plaintiff Jessica M. Georg is a citizen and resident of Forsyth County, North Carolina. Plaintiff has been employed by Defendant at its Winston-Salem store from November 29, 2012, to the present.

2. Defendant Costco Wholesale Corporation ("Costco") is a Washington corporation with its principal place of business and headquarters located at 999 Lake Drive, Issaquah, Washington 98027. At all relevant times, Defendant operated a retail warehouse store located at 1085 Hanes Mall Blvd, Winston-Salem, North Carolina 27103 (Store #361), where Plaintiff works. Defendant employs approximately 265 employees at the Winston-Salem location and employs more than 501 employees company-wide.

3. At all relevant times, Defendant employed more than fifteen (15) employees and is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(b).

4. At all relevant times, Defendant was a covered employer within the meaning of the FMLA, 29 U.S.C. § 2611(4).

3

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under federal law, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*.

6.     Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in Forsyth County, North Carolina, specifically at its Winston-Salem location at 1085 Hanes Mall Blvd, Winston-Salem, North Carolina 27103, and because the unlawful employment practices alleged herein were committed within this judicial district.

## ADMINISTRATIVE EXHAUSTION

7.     On December 21, 2022, Plaintiff filed a Charge of Discrimination with the EEOC, Charge Number 435-2023-00254, alleging sex discrimination, sexual harassment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended.

8.     On July 11, 2025, the EEOC issued a determination letter finding reasonable cause to believe that Defendant violated Title VII by subjecting Plaintiff to sexual harassment based on her sex and by retaliating against Plaintiff for

4

engaging in protected activity when she reported conduct that she reasonably and in good faith believed to be unlawful.

9. On November 18, 2025, the EEOC issued Plaintiff a Notice of Right to Sue letter.

10. This Complaint is timely filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue letter.

11. Plaintiff has satisfied all administrative prerequisites to file this action and has exhausted all required administrative remedies.

## **FACTS**

12. Plaintiff began her employment with Defendant on November 29, 2012, when she was hired as a seasonal, part-time Cashier Assistant at Defendant's Winston-Salem, North Carolina warehouse store.

13. On December 26, 2012, Plaintiff's employment classification was changed from seasonal to a permanent position.

14. On May 2, 2013, Plaintiff's position changed to Cashier, effective April 15, 2013, though she remained part-time.

15. Throughout her employment, Plaintiff performed her job duties competently and professionally and met all reasonable expectations of an employee

5

in her position. Defendant does not dispute that Plaintiff is generally a good employee.

## Costco's Knowledge of Wiggins' Pattern of Sexual Harassment of Multiple Women

16. Wiggins was employed by Defendant at the Winston-Salem warehouse beginning in or around 2006 and worked as a Front-End Supervisor despite a documented pattern of sexual harassment complaints spanning over a decade.

17. Defendant was aware of at least seven employees or former employees who complained to its management about sexual harassment by Wiggins, the earliest of which dates back to at least Summer 2011.

18. The first documented complaint was made in Summer 2011 by a female employee who reported that Wiggins made a sexual comment to her in the warehouse parking lot.

19. The second documented complaint was made in October 2012 by a female employee who reported that Wiggins made sexual overtures to her on several occasions.

20. The third documented complaint was made on August 10, 2017, when Plaintiff reported that Wiggins sexually assaulted her off campus that morning and

6

had also been making sexual overtures and comments to her at the store throughout her employment.

21. The fourth documented complaint was made in September 2020 by an employee who recently resigned and reported that Wiggins and two other male employees had taken advantage of her when she was drunk one evening four or five years earlier.

22. The fifth documented complaint was around the same time in September 2020, when Plaintiff re-raised her reports to management that Wiggins sexually assaulted her in 2017 and continued sexually harassing her at work, commenting that she had a "fat ass," "fat pussy," and telling her to work with her Latino coworkers because "I know how you love that Latino cock."

23. Complaints six through eight occurred around August 2022, when three female employees complained that Wiggins had made sexual comments to them.

24. These complaints were investigated in tandem with Plaintiff's 2022 sexual harassment complaint and were found to be substantiated. The investigation also uncovered two other females who had not come forward with complaints, but who also reported, when interviewed, that Wiggins had made flirtatious and sexual comments to them.

25. Wiggins was not terminated until March 2023, after Plaintiff filed her EEOC Charge in December 2022 and after Defendant's outside counsel

7

investigation substantiated complaints from multiple female employees. By that time, Wiggins had been sexually harassing women at the Winston-Salem warehouse for at least twelve years.

26. Upon information and belief, Wiggins was fired for sexually harassing multiple female employees, for being dishonest during his investigation interviews, and for having sex with a female employee in the warehouse bathroom while on duty during working hours.

27. Despite having knowledge of sexual harassment complaints against Wiggins dating back to at least 2011—before Plaintiff was even hired—Defendant not only retained Wiggins but promoted him to Supervisor with this knowledge, and allowed him to remain a Front-End Supervisor, a position that gave him supervisory authority over female employees.

28. Defendant's pattern was to take no meaningful corrective action, thus enabling him to use his position of authority to pressure female employees into sexual relationships and ratifying Wiggins to continue harassing female employees with impunity for over a decade.

**Wiggins' Sexual Assault and Harassment Against Plaintiff**

29. Beginning as early as 2012 and continuing through March 2023, Wiggins sexually harassed Plaintiff by making frequent, unwelcome, sexually

8

explicit comments about her body and sexual conduct. Wiggins made these harassing comments on a regular basis throughout Plaintiff's employment.

30. For example, when Plaintiff initially started in 2012, Wiggins offered to assist her with "getting some strange."

31. Wiggins repeatedly made sexually explicit comments to Plaintiff about her body parts, including telling Plaintiff that she had a "fat ass" and a "fat pussy," and making other graphic and suggestive comments about her body. During Defendant's 2020 investigation, Wiggins admitted to telling Plaintiff she had a "fat ass."

32. Wiggins told Plaintiff on multiple occasions, "I know why you didn't want to open - you would rather be with Latinos... Keep working with [Latino coworkers]" and made other sexually explicit comments suggesting Plaintiff preferred sexual encounters with Latino men and saying, "I know you love that Latino cock."

33. Plaintiff initially consented to some sexual contact in approximately 2016; however, after that, Plaintiff ultimately made clear to Wiggins that she was not interested in any further sexual contact with him.

34. The sexual harassment by Wiggins became so severe and pervasive that on or about August 15, 2016, Plaintiff voluntarily demoted herself from her Front-

9

End Cashier position to a part-time Maintenance Assistant position to avoid him and his offensive behavior.

35. This demotion resulted in a reduction in Plaintiff's pay and employment status.

36. The Maintenance Assistant position was so undesirable that Plaintiff was the only person in the warehouse to apply for it.

37. Plaintiff took this drastic step specifically to avoid Wiggins' ongoing sexual harassment and to separate herself from the Front-End environment where Wiggins worked as a supervisor and where his harassing behavior was generally accepted.

38. On the evening of August 9, 2017, Plaintiff attended a social gathering at the residence of her coworker, E.D. Wiggins, who came to E.D.'s residence that evening. During the early morning hours on August 10, 2017, Wiggins sexually assaulted Plaintiff.

39. On or about August 10, 2017, hours after the assault occurred, Plaintiff reported it and Wiggins's pattern of workplace sexual harassment to her managers, Tara Coltman and Chase Pullen. Plaintiff was visibly upset and broke down during her shift. Coltman and Pullen brought Plaintiff into the office to determine whether she needed assistance. Plaintiff told both managers about the assault and about the sexual harassment she had experienced from Wiggins throughout her employment.

40. After speaking with Plaintiff, Coltman gave Plaintiff information about Defendant's employee assistance program, and Pullen escorted Plaintiff out of the building through a side emergency exit so she would not be seen by her peers and members on the busy Front End in an emotional state.

41. Coltman told Plaintiff that if anything else happened with Wiggins, she should immediately report it. However, Coltman and Pullen told Plaintiff that since the assault was an off-campus incident, there was nothing Costco would do about it, but that Plaintiff's allegation of harassment in the workplace would be investigated.

42. Despite Plaintiff's August 2017 report to management, no investigation was conducted at that time, and Wiggins was not disciplined or separated from Plaintiff.

43. In September 2020, another (former) female employee, E.D., filed a complaint against Wiggins for sexual harassment and assault. As part of the investigation into E.D.'s complaint, then General Manager Alfredo Rodriguez interviewed Plaintiff.

44. During this interview, Plaintiff again reported to Rodriguez that she felt she had been sexually assaulted by Wiggins in 2017 and that Wiggins had directed sexually harassing comments towards her on several occasions, including that Wiggins told her she had a "fat ass" and a "fat pussy."

45. Following Plaintiff's 2020 report, Rodriguez interviewed Wiggins.

11

46. Wiggins denied most of Plaintiff's allegations but admitted that he told Plaintiff she had a "fat ass." Rodriguez gave Wiggins a "coaching" for the one remark Wiggins admitted making.

47. Rodriguez did not issue any discipline to Wiggins over the alleged assault. Despite Defendant's policy stating that sexual harassment violations can result in immediate termination and that, at a minimum, a permanently retained Employee Counseling Notice must be issued, Wiggins received only informal verbal coaching.

48. The coaching failed to correct the behavior, and after the 2020 investigation and coaching, Wiggins continued to sexually harass Plaintiff.

49. In or about July 2022, Plaintiff was called over the radio to help clean up a leaking watermelon. While Plaintiff was cleaning up the mess, Wiggins approached her with a new young Latino employee, Carlos Muniz. While Plaintiff was showing Muniz how to clean the mess, Wiggins stood over them and made sexually explicit comments, stating that Plaintiff and Muniz would be a compatible sexual match because Plaintiff "liked that Latin dick," and she "likes them young."

50. On the evening of August 19, 2022, Plaintiff spoke on the phone with her coworker, A.J. A.J. confided in Plaintiff that she was having issues with being sexually harassed by Wiggins and that her formal report to management had not

12

stopped the harassment. A.J. explained that she was also aware that at least one other coworker had made a recent report regarding sexual harassment by Wiggins.

51.     Driven by this new information and by the knowledge that multiple women were being victimized, Plaintiff determined she would not relent until ensuring that measures would be taken by Defendant to put an end to Wiggins' rampant misconduct.

52.     On August 20, 2022, at Plaintiff's request, Plaintiff met with General Manager Keith Napolitano and Manager Jesse Rodriguez.

53.     During this meeting, Plaintiff explained to Napolitano that she had become aware of new reports of harassment against Wiggins. Plaintiff explained her prior allegations and the continued harassment by Wiggins. Plaintiff explained that Wiggins was generally careful to avoid making harassing comments in front of witnesses. Plaintiff urged Napolitano to dig deeper into compiling the full picture of sexual harassment allegations against Wiggins and begged for the hostile work environment to stop.

54.     Later that same day, Plaintiff was called back into the office to discuss Napolitano's findings. Rodriguez sat in as a witness to the conversation. Napolitano stated that he had collected information by speaking with former General Manager Alfredo Rodriguez. Alfredo Rodriguez is the husband of Jesse Rodriguez.

13

55. Napolitano spoke very nonchalantly about what he had gathered, stating there were at least five years during which sexual harassment allegations about Wiggins had been made, with the earliest year being 2010. However, Napolitano then explained that there was a several-year gap in time between some of the allegations, that one of the accusers had subsequently recanted her allegations, and that Plaintiff's situation "involved alcohol." At no time did Napolitano state that he would contact Human Resources or take any action to stop the harassment. He gave no indication that Plaintiff's concerns would be further investigated.

56. Realizing that Napolitano was dismissing her concerns and ratifying the harassment, Plaintiff decided to utilize Defendant's Open Door Policy by escalating to higher levels of management.

57. Plaintiff repeatedly contacted corporate human resources until she was able to obtain the contact information for Regional Vice President Tom Feely.

58. On August 23, 2022, Plaintiff reached out to Feely both via email and by leaving him a voicemail regarding her concerns about Wiggins' ongoing sexual harassment of multiple female employees. Feely returned Plaintiff's phone call that same day and spoke with Plaintiff regarding her concerns. Feely stated that he would speak with Napolitano to determine how to proceed and would contact Plaintiff back.

59. On September 5, 2022, Plaintiff provided details to Napolitano via email regarding another instance of harassment from Wiggins involving the watermelon incident and Carlos Muniz. Napolitano never responded to that email.

60. Plaintiff was subsequently provided with contact information for Human Resources Personnel Specialist Carlos Corniel.

61. On August 25, 2022, Corniel interviewed Plaintiff regarding her allegations via phone call.

62. On August 21, 2022, Assistant General Manager Ray Vasquez presented Plaintiff with a copy of an Acknowledgement of Confidentiality for Investigations form to sign, which they both signed. The form contained provisions requiring Plaintiff to maintain confidentiality regarding the ongoing investigation and prohibiting recording of interviews, with violations subject to disciplinary action up to and including termination.

63. During the investigation, Defendant's managers monitored and documented Plaintiff's interactions with other employees about the alleged harassment. Corniel explained to Plaintiff the importance of the confidentiality acknowledgment and stated that if Plaintiff spoke with other co-workers about the harassment of others, Defendant would need to address the issue and discipline Plaintiff.

64. Plaintiff felt that this was a clear attempt to silence and intimidate those who reported sexual harassment.

65. Despite Defendant's confidentiality requirements, Plaintiff felt that the investigation was not being conducted confidentially because Wiggins had stopped approaching her, and both Wiggins and his sister, who also worked at the warehouse, suddenly began avoiding all contact with Plaintiff.

66. On September 28, 2022, Plaintiff spoke with Corniel via telephone. Plaintiff made him aware that she found it unusual that Wiggins was suddenly avoiding all contact with her, given the confidential status of the investigation, which she suggested constituted a breach of confidentiality.

67. On or about November 13, 2022, Napolitano approached Plaintiff and asked if she had heard from corporate. When Plaintiff stated she had not, Napolitano said she should hear from them soon because "something is happening."

68. On November 16, 2022, Plaintiff left a voicemail for Corniel requesting a call back for an update on the investigation. After receiving no return call, Plaintiff called Corniel again on November 18, 2022, and reached him. Plaintiff asked about Napolitano's comment that "something is happening." Corniel stated there must have been a "miscommunication" between himself and Napolitano. Corniel then explained that, during his investigation, he had uncovered sufficient information to warrant bringing in outside counsel to take over the investigation.

16

69. Just hours later, on November 18, 2022, Plaintiff was pulled into the office to be interviewed by Defendant's legal representative, Stephanie Delatorre from the law firm Seyfarth Shaw LLP, which has represented Defendant in numerous Title VII litigations. The interval between Plaintiff's initial interview with Corniel on August 25, 2022, and the interview with outside counsel exceeded 12 weeks.

70. Delatorre began the interview by asking if Plaintiff had secured her own legal counsel. When Plaintiff responded with confusion, "Should I have?", Delatorre stated that she could not provide Plaintiff with legal advice because she represented only Defendant and not Plaintiff. Delatorre told Plaintiff that since she represented Defendant and not Plaintiff, any statements Plaintiff made to her would not be covered by the attorney-client privilege.

71. During the November 18, 2022, interview, Delatorre questioned Plaintiff about the August 10, 2017, sexual assault. The interview felt more like an interrogation than an investigation interview, with Delatorre blaming Plaintiff for the assault, asking detailed questions about what Plaintiff was drinking, how much she had drunk, what she was wearing, how and where Wiggins began touching her, and what Plaintiff did when he began touching her.

72. Plaintiff was interviewed again by Delatorre on November 20, 2022, at Plaintiff's request. During this interview, Plaintiff raised concerns that Defendant

17

retaliated against her, including by reducing her hours as a cashier. She also told Delatorre that she refrained from applying for a promotion to Front End Supervisor to avoid working alongside Wiggins, despite other managers affirming she would be a worthy candidate. Additionally, she told Delatorre she was considering filing an EEOC Charge.

73. At no time during either interview with Delatorre did Plaintiff write any statements or sign anything. Delatorre took notes on her laptop, but the transcribed notes were never shown to the Plaintiff for review.

74. Prior to and during the interview, Plaintiff made specific requests for copies of documents from the prior 2017 and 2020 investigations. Other than a September 29, 2020, letter from General Manager Alfredo Rodriguez directing Plaintiff not to discuss the investigation, Defendant failed to provide the requested documents.

75. During the investigation, Defendant failed to interview key witnesses. On information and belief, Defendant never contacted E.D., who was present at her residence the night of the August 10, 2017, assault and who had also filed her own complaint against Wiggins in 2020. When Plaintiff asked Muniz on May 8, 2023, whether he had been interviewed about the watermelon incident, Muniz stated he had not been interviewed about anything regarding Plaintiff.

76. Meanwhile, after Plaintiff's August 2022 complaints to management and escalation to Regional Vice President Feely, Defendant began retaliating against Plaintiff.

77. Prior to Plaintiff's August 23, 2022, report to Feely, Plaintiff was regularly called by name over the radio to assist on the Front End as a Cashier, which paid at a higher rate than her Maintenance Assistant position. Each of Plaintiff's annual Employee Performance Reviews, beginning in 2017, referenced her utilization on the Front End. Her 2019 review specifically stated under Teamwork: "Jessica is always helping on the Front End and still completing her own tasks in maintenance."

78. Following Plaintiff's August 23, 2022, complaint to Feely, Defendant drastically reduced Plaintiff's opportunities to work as a Cashier. By way of example, during the eleven pay periods prior to her August 23, 2022, complaint to Feely, Plaintiff worked as a Cashier twenty-five times within the thirteen weeks prior to August 23, 2022. In contrast, during the eleven pay periods following her complaint to Feely, Plaintiff was called to work as a Cashier only fourteen times - a reduction of forty-four percent, within the following thirteen weeks. Thereafter, Plaintiff's Cashier opportunities remained drastically reduced after this time period.

79. On August 10, 2017, the day Plaintiff reported her assault to management, Plaintiff's timecard shows that she spent over thirty-seven percent of

19

her shift working on the Front End. In contrast, after her August 2022 complaints, Plaintiff's Front-End hours were drastically reduced.

80. In addition to reducing Plaintiff's Cashier opportunities, Defendant subjected Plaintiff to increased monitoring and scrutiny after her complaints.

81. On November 23, 2022, shortly after Plaintiff's interviews with outside counsel, Plaintiff received her 2022 Employee Performance Review. The review was conducted and signed by Administrative Manager Jason Devens.

82. Unlike Plaintiff's previous performance reviews, which had been consistently positive, the 2022 review contained multiple negative comments and contradictory statements. Under "Teamwork," the review stated: "We have seen Jessica have an upbeat attitude and 'can-do' spirit, however we would like it to be more consistent." This comment questioned Plaintiff's consistency just five days after Plaintiff had been subjected to a two-hour interrogation by Defendant's employment lawyer about being sexually assaulted by a coworker - an interview that left Plaintiff so overwhelmed and distraught that she asked to be put on the sick log for the next day before even leaving the warehouse.

83. The 2022 review also stated under "Quantity & Quality of Work": "[W]e would like to challenge Jessica to make sure her own duties are taken care of first before volunteering to help others." This comment contradicted the praise under "Flexibility," which stated Plaintiff was praised for "making sure that what is

20

requested of her is taken care of." On the one hand, Plaintiff was criticized for assisting others when asked; on the other, she was praised for completing what management requested.

84. When Plaintiff attempted to make notations on her 2022 performance review regarding her concerns, Devens discouraged her from doing so, stating that she shouldn't put any comments as it could be looked upon negatively if she applied for a different position or transfer in the future. The Employee Performance Review contains a designated section for "Employee Comments," yet Plaintiff was discouraged from using it.

85. Prior to the 2022 review, the last review containing any statement regarding an area where Plaintiff could improve was in 2019, which merely noted under Member Service that "She can sometimes engage in idle chatter with fellow employees, but has the ability to still complete tasks in a timely manner."

86. After Plaintiff's complaints and during the EEOC's investigation, Defendant issued Plaintiff multiple disciplinary write-ups. Between April 2024 and October 2025, Plaintiff received ten write-ups, culminating in a suspension on October 1, 2025. Four of these disciplinary actions occurred within three months of the EEOC's July 11, 2025, determination that Defendant subjected Plaintiff to sexual harassment and retaliation, including the October 1 suspension for FMLA-protected absences.

87. Many of these write-ups, and the suspension, were for tardies and absences related to Plaintiff's PTSD diagnosis, adjustments to her medication, and panic attacks caused by Wiggins and Defendant. Throughout the investigation, Plaintiff pleaded with Defendant to correct the hostile work environment while the investigation continued. On November 26, 2022, Plaintiff texted Delatorre asking for steps that would be taken to protect her. Delatorre responded that she could not provide Plaintiff with information regarding the ongoing confidential investigation.

88. On December 8, 2022, Plaintiff spoke with Corniel via phone call, explaining to him the mental and physical toll it was taking on her to have Wiggins continue to be present in the warehouse. Plaintiff explained that just the sound of Wiggins' voice over the radio she carried invoked a visceral reaction in her, such as nausea and an increased heart rate. Plaintiff explained that she was filled with angst each day she went to work, wondering whether Wiggins would be there, and that just seeing Wiggins' vehicle in the parking lot on her way in put her on the verge of a panic attack.

89. Plaintiff referenced Section 11.2 of Defendant's 2022 Employee Agreement, which gives Defendant the option to give an accused employee an unpaid suspension either to investigate a major offense or as an alternative to termination; and, the policy provides if the accused is cleared of violations, the suspension is paid. Corniel told Plaintiff, "that's not how it works."

90.     After her conversation with Corniel, Plaintiff approached Assistant General Manager Kim Reed to request that she leave work early. When Reed asked what was wrong, Plaintiff explained how her requests that Defendant adhere to its policies in Section 11.2 of the Employee Agreement were being dismissed. Reed explained it would be "unfair" to suspend Wiggins. So, Wiggins continued working during Defendant's lengthy investigation.

91.     After her conversation with Reed, Plaintiff clocked out and exited to her vehicle, where she vomited in the parking lot from the overwhelming stress. Plaintiff went to her doctor the next day to discuss the exacerbation of symptoms of anxiety. Plaintiff was removed from work and placed on a leave of absence.

### Plaintiff's PTSD Diagnosis

92.     On December 13, 2022, Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD), later updated to chronic PTSD.

93.     Plaintiff has been continuously treated for PTSD by her psychiatrist and therapist from December 2022 through the present.

94.     Plaintiff's PTSD symptoms include panic attacks, nightmares, hypervigilance, dissociation, derealization, difficulties concentrating, intrusive thoughts, and avoidance behaviors. Plaintiff's treatment notes document multiple episodes of panic, freeze responses, and heightened anxiety triggered by work-related stressors and reminders of the harassment and assault.

23

95.    Plaintiff has been prescribed multiple medications for her PTSD, anxiety, related conditions, and panic attacks.

96.    Plaintiff has required multiple periods of medical leave from work due to the severity of her PTSD symptoms and the triggering nature of the work environment.

97.    On October 12, 2025, Plaintiff experienced triggering incidents at work in which the name of Wiggins was mentioned, causing Plaintiff to experience a series of trauma responses, including panic and dissociation.

98.    Plaintiff's ongoing PTSD and the hostile work environment created by Defendant's failure to address Wiggins' harassment have prevented Plaintiff from pursuing promotional opportunities. Plaintiff has been asked by members of management on several occasions why she has not applied for open Front End Supervisor positions, with assurances that she would be a worthy candidate for such a promotion. However, Plaintiff could not honestly state that working alongside her assailant as a fellow supervisor was not appealing, as confidentiality requirements under the threat of termination inhibited her from explaining her true reasons.

**Wiggins is Finally Terminated**

99.    On March 24, 2023, Regional Vice President Tom Feely sent Plaintiff a letter advising her about the results of the investigation. The letter informed Plaintiff that Wiggins was no longer employed by Defendant. The letter stated:

24

"Finally, in order to protect the privacy of everyone involved, we've taken steps to handle this matter in confidence. We hope and expect that you will treat the information contained in this letter in the same manner."

100. Wiggins was terminated in March 2023 for violating Defendant's Anti-Harassment Policy, but only after Plaintiff filed her EEOC charge in December 2022 and only after Defendant's external investigation substantiated complaints from multiple other female employees against Wiggins.

101. On March 24, 2023, Plaintiff filed an incident report regarding the August 10, 2017, sexual assault with the Winston-Salem Police Department, Case Number 2312130.

102. At least three other female employees at the Winston-Salem warehouse filed sexual harassment complaints against Wiggins in 2022. The outside investigation substantiated complaints made by other female employees against Wiggins, demonstrating that Defendant knew of Wiggins' pattern of harassment but failed to take adequate corrective action until compelled to do so by the EEOC investigation.

103. Throughout Plaintiff's employment, Defendant maintained a pattern and practice of failing to properly investigate and address sexual harassment complaints from female employees, including Plaintiff. Despite receiving complaints against Wiggins dating back to at least 2011, and despite Wiggins

25

admitting to making sexually inappropriate comments to Plaintiff in 2020, Defendant failed to discipline Wiggins appropriately or take action to protect its female employees until compelled to do so by the EEOC's investigation.

104. Defendant knew or should have known about Wiggins' dangerous propensities and history of sexually harassing female employees, yet continued to employ him and failed to adequately supervise him, allowing his harassment to continue for over a decade.

105. The hostile work environment at Defendant's Winston-Salem warehouse was severe and pervasive, affecting Plaintiff and multiple female employees over many years and creating an atmosphere where they felt unsafe and unprotected from sexual harassment.

106. Defendant's failure to take prompt and appropriate corrective action after receiving multiple reports of Wiggins' sexual harassment over more than a decade demonstrated deliberate indifference to the rights and safety of Plaintiff and other female employees.

107. Even after Plaintiff's August 2017 report of sexual assault and harassment, Defendant failed to conduct a proper investigation, failed to discipline Wiggins, and failed to implement any measures to separate Plaintiff from Wiggins or prevent further harassment.

108. Defendant's inadequate response to Plaintiff's 2020 complaint - giving Wiggins only an informal verbal coaching after he admitted to sexually harassing Plaintiff - failed to deter Wiggins' continued harassment and demonstrated that Defendant did not take sexual harassment complaints seriously.

109. Defendant's requirement that Plaintiff and other complainants sign confidentiality agreements during investigations, combined with threats of termination for discussing the investigation, created a chilling effect that discouraged employees from supporting each other and from engaging in protected concerted activity to address workplace harassment.

110. Defendant's lengthy delays in investigating Plaintiff's August 2022 complaints - taking over twelve weeks to bring in outside counsel and months to complete the investigation - allowed Wiggins to remain in the workplace harassing Plaintiff and others, causing Plaintiff ongoing emotional distress and exacerbating her PTSD symptoms.

111. The reports and communications to Defendant, the constructive discharge or forced resignations of other female employees, and the eventual termination of Wiggins in March 2023 for similar conduct against multiple female employees demonstrate that Defendant knew of the severity and pervasiveness of Wiggins' behavior but chose not to act until after Plaintiff filed her EEOC charge and substantial damage to Plaintiff had already occurred.

27

112. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer severe emotional distress, humiliation, mental anguish, loss of enjoyment of life, and other non-economic damages.

113. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer economic damages, including lost wages from her voluntary demotion in 2016, time out of work, reduced cashier hours after reporting harassment, medical expenses for PTSD treatment and medications, and lost promotional opportunities.

**COUNT I**
**(Sexual Harassment, Hostile Work Environment, and Sex Discrimination in Violation of Title VII - Against Defendant)**

114. The allegations in the previous paragraphs are realleged and incorporated herein by reference.

115. At all relevant times, Plaintiff was an employee covered by the protections of Title VII, as defined in 42 U.S.C. § 2000e(f).

116. At all relevant times, Defendant employed fifteen (15) or more employees and was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

117. Defendant violated Title VII by subjecting Plaintiff to unwelcome sexual harassment by Wiggins, including but not limited to:

    a. Offering to assist Plaintiff with "getting some strange";

b. Repeated sexually explicit comments about Plaintiff's body parts, including telling Plaintiff she had a "fat ass" and a "fat pussy";

c. Repeated sexually explicit comments suggesting Plaintiff preferred sexual encounters with Latino men, including "I know why you didn't want to open - you rather be with Latinos... Keep working with [Latino coworkers]" and "I know you love that Latino cock";

d. Sexually explicit comments in July 2022 stating that Plaintiff and a young Latino employee would be a compatible sexual match because Plaintiff "liked that Latin dick";

e. Sexual assault of Plaintiff on August 10, 2017;

f. Taking "every opportunity" to make sexual comments directed at Plaintiff when no witnesses were present;

g. Creating an intimidating and hostile work environment;

h. And in other ways to be proven at trial.

118. The harassment Plaintiff experienced was based on her sex.

119. The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and created an abusive working environment.

120. The hostile work environment was both objectively and subjectively offensive, as evidenced by:

a. Repeated instances of unwelcome sexual harassment occurring over at least eleven (11) years, from 2012 through September 2022;

b. Multiple incidents of sexually explicit comments about Plaintiff's body and sexual preferences;

c. Sexual assault of Plaintiff in August 2017;

d. At least six other female employees filed sexual harassment complaints against Wiggins;

e. The 2022 investigation revealed there were other women who were harassed though they did not come forward with complaints;

29

f. Plaintiff's voluntary demotion in August 2016 from Cashier to Maintenance Assistant to avoid Wiggins' harassment, resulting in reduced pay and status;

g. Wiggins' admission in the 2020 investigation to telling Plaintiff she had a "fat ass";

h. Wiggins' eventual termination in March 2023 for violation of Defendant's Anti-Harassment Policy after complaints from multiple female employees were substantiated;

h. Plaintiff's PTSD diagnosis and ongoing treatment caused by the harassment and assault;

i. Plaintiff's inability to pursue Front End Supervisor promotional opportunities due to Wiggins' continued presence;

j. And other ways to be proven at trial.

121. Defendant had actual knowledge of the harassment through:

a. Plaintiff's direct report to managers Tara Coltman and Chase Pullen on August 10, 2017, regarding the sexual assault and ongoing workplace harassment;

b. Plaintiff's direct report to General Manager Alfredo Rodriguez in September 2020 regarding the sexual assault and ongoing harassment;

c. Complaints from other female employees, including E.D., A.J., and at least three other female employees;

d. Plaintiff's direct reports to General Manager Keith Napolitano on August 20, 2022;

e. Plaintiff's escalation to Regional Vice President Tom Feely on August 23, 2022;

f. Napolitano's own investigation revealing allegations against Wiggins dating back to at least 2010;

g. And in other ways to be proven at trial.

122. Despite this knowledge, Defendant failed to take prompt and

appropriate corrective action to address the harassment by:

a. Retaining Wiggins for years despite knowing of his harassment of multiple female employees over more than a decade;

b. Failing to conduct a proper investigation or take any disciplinary action after Plaintiff's August 2017 report of sexual assault and harassment;

30

c. Failing to discipline Wiggins meaningfully after the September 2020 investigation, giving him only an informal verbal "coaching" after he admitted to sexually harassing Plaintiff, despite Defendant's policy requiring, at a minimum, a permanently retained Employee Counseling Notice for sexual harassment violations;

d. Allowing Wiggins to continue working in proximity to Plaintiff and other female employees after multiple complaints;

e. Failing to prevent ongoing harassment, as evidenced by continued harassment through at least July 2022;

f. Refusing to suspend Wiggins during the lengthy investigation from August 2022 through March 2023, despite Plaintiff's repeated pleas and Defendant's own policy allowing for investigative suspensions;

g. And in other ways to be proven at trial.

123. Defendant's actions and inactions created and perpetuated a hostile work environment that was severe and pervasive enough to affect the terms and conditions of Plaintiff's employment.

124. As an actual, proximate, and foreseeable result of Defendant's conduct, Plaintiff has suffered lost income from her voluntary demotion and reduced hours, damage to reputation, severe emotional distress, mental anguish, anxiety, depression, PTSD, humiliation, embarrassment, medical expenses, and other compensatory damages.

125. Defendant's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant knowingly retained Wiggins for years despite repeated complaints from multiple female employees, failed to conduct adequate investigations, failed to implement meaningful discipline, and allowed the harassment to continue unabated. As a result

31

of Defendant's conduct, Plaintiff is entitled to recover punitive damages under 42 U.S.C. § 1981a.

126. Plaintiff is entitled to all relief available by law, including but not limited to back pay, front pay, compensatory damages, punitive damages, injunctive relief, attorneys' fees, costs, interest at the legal rate, and a tax adjustment on any lump sum payment.

## COUNT II
### (Retaliation in Violation of Title VII - Against Defendant)

127. The allegations in the previous paragraphs are realleged and incorporated herein by reference.

128. Plaintiff engaged in protected activity under Title VII by:

   a. Reporting sexual harassment and sexual assault by Wiggins to managers Tara Coltman and Chase Pullen on August 10, 2017;
   b. Reporting sexual harassment by Wiggins to General Manager Alfredo Rodriguez in September 2020;
   c. Reporting sexual harassment by Wiggins to General Manager Keith Napolitano and Manager Jesse Rodriguez on August 20, 2022;
   d. Escalating her complaints to Regional Vice President Tom Feely on August 23, 2022;
   e. Reporting the July 2022 harassment incident to Napolitano via email on September 5, 2022;
   f. Filing a Charge of Discrimination with the EEOC on December 21, 2022;
   g. And in other ways to be proven at trial.

129. Defendant took adverse employment actions against Plaintiff, including:

a. Drastically reducing Plaintiff's cashier opportunities after her August 23, 2022 complaint to Regional Vice President Feely - from twenty-five times in the eleven pay periods before her complaint to only fourteen times in the eleven pay periods after her complaint, a reduction of forty-four percent within the thirteen weeks following her complaint, and her hours were reduced thereafter;

d. Providing Plaintiff with a negative performance evaluation on November 23, 2022, containing critical comments that were inconsistent with Plaintiff's prior consistently positive reviews and that contradicted other portions of the same review;

e. Discouraging Plaintiff from making written comments on her 2022 performance review despite a designated section for employee comments;

f. Monitoring and documenting Plaintiff's interactions with other employees about the harassment;

g. Issuing Plaintiff multiple disciplinary write-ups in six months between April 2024 and October 2025, with four of those disciplinary actions occurring shortly after the EEOC issued its July 11, 2025 determination finding reasonable cause finding, including a suspension by October 2025;

h. And in other ways to be proven at trial.

130. A causal connection exists between Plaintiff's protected activity and the adverse employment actions taken against her, as evidenced by:

a. Temporal proximity - the retaliation began immediately after Plaintiff's August 2022 complaints and intensified after she filed her EEOC charge in December 2022 and received the EEOC cause finding in July 2025;

b. The drastic reduction in Plaintiff's cashier opportunities began immediately after her August 23, 2022, escalation to Regional Vice President Feely;

c. The negative performance evaluation was provided on November 23, 2022, just days after Plaintiff's November 18 and 20, 2022, interviews with Defendant's outside investigator and just weeks after Plaintiff filed her EEOC charge;

33

d. The sudden increase in disciplinary write-ups occurred after Plaintiff's complaints and EEOC charge filing and the EEOC's cause finding;
e. The pattern of adverse actions followed each instance of Plaintiff's protected activity;
f. And in other ways to be proven at trial.

131. As an actual, proximate, and foreseeable result of Defendant's retaliatory conduct, Plaintiff has suffered lost income, reduced hours, damage to reputation, severe emotional distress, mental anguish, anxiety, depression, PTSD, humiliation, embarrassment, and other compensatory damages.

132. Defendant's retaliatory actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant deliberately punished Plaintiff for exercising her right to report sexual harassment and file an EEOC charge. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages under 42 U.S.C. § 1981a.

133. Plaintiff is entitled to all relief available by law, including but not limited to back pay, front pay, compensatory damages, punitive damages, injunctive relief, reinstatement or front pay in lieu of reinstatement, attorneys' fees, costs, interest at the legal rate, and a tax-adjustment on any lump sum payment.

## COUNT III

**(Family and Medical Leave Act Interference and Retaliation - Against Defendant)**

34

134. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

135. At all relevant times, Plaintiff was an eligible employee under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*., having been employed by Defendant for over twelve years and having worked well in excess of 1,250 hours in the twelve months prior to any leave request. Defendant is a covered employer under the FMLA.

136. The FMLA, 29 USC § 2612(b)(1), requires that an "eligible employee" with a "serious health condition" be permitted to take protected leave intermittently or continuously when medically necessary.

137. Plaintiff suffers from chronic Post-Traumatic Stress Disorder (PTSD), which constitutes a serious health condition under the FMLA as defined by 29 USC § 2611(11).

138. Plaintiff has been continuously treated for PTSD from December 2022 through the present.

139. Employers cannot use the taking of FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220(c).

140. Despite Plaintiff's documented FMLA-qualifying condition, medical certification supporting leave, and explicit FMLA request, Defendant discriminated

against, interfered with, and retaliated against her for exercising her right to leave under the FMLA.

141. Between April 2024 and October 2025, Defendant issued Plaintiff about ten Employee Counseling Notices for absences and tardiness that were directly caused by her FMLA-qualifying PTSD and the side effects of medications prescribed to treat that condition.

142. Six days after Plaintiff's September 25, 2025, explicit FMLA request, Defendant suspended Plaintiff on October 1, 2025, citing disciplinary violations that included FMLA-qualifying absences and tardiness.

143. Defendant had actual knowledge of Plaintiff's FMLA-qualifying serious health condition since December 2022, when Plaintiff was placed on medical leave for PTSD. Defendant was aware that Plaintiff's absences and tardiness were caused by this condition and its treatment.

144. Defendant interfered with Plaintiff's FMLA rights by failing to designate Plaintiff's qualifying absences as FMLA leave, disciplining Plaintiff for FMLA-qualifying absences and tardiness instead of counting them against her FMLA entitlement and suspending Plaintiff eight days after she explicitly requested FMLA leave.

145. Defendant retaliated against Plaintiff for requesting FMLA leave by suspending her on October 1, 2025, and by continuing to discipline her for FMLA-qualifying absences and tardiness.

146. Defendant used Plaintiff's intermittent leave as a negative factor against Plaintiff in the actions described above.

147. As a direct and proximate result of Defendant's interference with and retaliation for Plaintiff's exercise of her FMLA rights, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits.

148. Plaintiff is entitled to all relief available by law, including but not limited to, back pay, front pay, reinstatement or front pay in lieu of reinstatement, injunctive relief, attorneys' fees, costs, interest at the legal rate, and a tax-adjustment on any lump sum payment.

149. Defendant's conduct was willful within the meaning of 29 U.S.C. § 2617(a)(1), entitling Plaintiff to liquidated damages.

## JURY TRIAL DEMANDED

Plaintiff asks that this matter be tried by a jury of her peers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

1. Enter a judgment against Defendant Costco Wholesale Corporation;

2. Award Plaintiff compensatory damages for all losses suffered as a result of Defendant's unlawful conduct in an amount to be determined at trial;

3. Award Plaintiff back pay, front pay, lost wages and benefits, out-of-pocket expenses, and a tax-adjustment for any lump sum payment;

4. Award Plaintiff compensatory damages for emotional distress, mental anguish, pain and suffering, and damage to her reputation;

5. Award Plaintiff liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

6. Award Plaintiff punitive damages pursuant to 42 U.S.C. § 1981a;

7. Award Plaintiff pre-judgment and post-judgment interest at the maximum rate allowed by law;

8. Award Plaintiff all reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

9. Award Plaintiff all reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 2617(a)(3);

10. Grant a trial by jury on all issues so triable; and

38

11. Award Plaintiff such other and further relief, both legal and equitable, as this Court deems just and proper.

This the 13th day of February, 2026.

DAGGETT SHULER,
ATTORNEYS AT LAW

/s/Benjamin P. Winikoff
Benjamin P. Winikoff (49625)
2140 Country Club Road
Winston-Salem, NC 27104
Phone: (336) 464-0862
Facsimile: (336) 464-0864
Email: bwinikoff@daggettshulerlaw.com

TIN, FULTON, WALKER & OWEN, PLLC

/s/ Jennifer D. Spyker
Jennifer D. Spyker (N.C. Bar #46048)
301 East Park Avenue
Charlotte, NC  28203
Tel.:   704-338-1220
Fax:   704-338-1312
Email: jspyker@tinfulton.com

*Attorneys for Plaintiff*